Argued February 9, affirmed August 22, 1956

In re Estate of Nan M. Wagner, Deceased

VAN WASSENHOVE et al v. HELTZEL et al

300 P. 2d 783

*George A. Rhoten,* Salem, argued the cause for appellants. On the brief were Rhoten, Rhoten & Speerstra and Carlotta Hendricks, Salem.

*Wallace P. Carson,* Salem, argued the cause for respondent John A. Heltzel, Executor. With him on the brief were Allan G. Carson and Peter M. Gunnar, Salem.

*Robert A. Bennett,* Portland, argued the cause and filed a brief for respondent Oregon-Washington Pythian Home.

*Catherine Zorn,* Assistant Attorney General, Salem, argued the cause for respondent Doernbecher Memorial Hospital for Children. With her on the brief was Robert Y. Thornton, Attorney General, Salem.

Before WARNER, Chief Justice, and ROSSMAN, LATOURETTE and PERRY, Justices.

ROSSMAN, J.

This is an appeal from a decree of the Circuit Court for Marion County, Probate Department, which, after trial, (1) overruled the contest of an instrument presented for probate by the proponent-respondent as the last will and testament of Nan M. Wagner, deceased, and (2) held that the instrument presented by the proponent-respondent was the last will of the decedent, that the latter had not revoked it and that it was entitled to probate in solemn form. The will was executed December 20, 1948, when the deceased was 73 years of age. The instrument was prepared for the deceased by Mr. John A. Heltzel, an attorney whose office is in Salem. He had performed legal services

for her since 1932. The appellants' brief refers to Mr. Heltzel as a lawyer "of the highest standing." Mr. Heltzel, who was nominated in the will as executor, is the proponent-respondent.

Nan M. Wagner, who remained unmarried, was a long-time resident of Salem where she died April 29, 1952, aged 77 years. Her estate was appraised as worth $114,858.41. The contestants, all cousins of the decedent, constitute a majority of her collateral heirs. One provision of the challenged will reads as follows:

"FOURTEENTH: All my relatives (except as specifically mentioned herein) are intentionally omitted from this Will and shall not receive any portion of my estate."

The contestants averred that the decedent had canceled and revoked her will, depriving it of legal effect. They claimed that the revocation occurred on or about September 5, 1950. There is no charge that Miss Wagner lacked testamentary capacity when she executed her will in 1948, nor does anyone claim that she was subjected to undue influence. The will was executed in accordance with statutory requirements. It is four pages in length, contains 20 clauses, bears the testatrix' signature at the bottom of pages one and two and is signed again at the end on page three where her signature is attested by two witnesses. Page four carries the attestation clause and there the signatures of the witnesses are repeated.

The will begins:

"I, NAN M. WAGNER, of Salem, Oregon, hereby revoke all my previous testamentary declarations and declare my will as follows:

"FIRST: I bequeath $500 to my cousin ELLA BREYMAN DEMMER at 2135 S. E. Elliott Avenue, Portland, Oregon."

That provision is succeeded by eleven clauses each of which makes a bequest. Two of the devisees were St. Joseph's Catholic Church of Salem and Marylhurst College. The other nine were individuals who were friends of the decedent. The thirteenth is the residuary clause and reads:

"THIRTEENTH: All the residue of my estate I hereby give, devise and bequeath as follows:

"One fourth thereof to the Pythian Home for elderly men at Vancouver, Washington, operated by the Knights of Pythias Lodge, in memory of my late brother BASIL H. WAGNER, who was a member of the Salem Lodge;

"Three-fourths thereof to the DOERNBECHER HOSPITAL FOR CHILDREN, which is a unit of the University of Oregon Medical School Hospitals, and is located on Marquam Hill in Portland, Oregon."

We have already quoted clause 14. Clause 15 declared:

"All my property not herein specifically bequeathed shall be sold for cash for the purpose of distribution of my estate. * * *"

Each of clauses 16, 17 and 18 mentions an item of real property owned by the decedent, the name of the lessee, the amount of the rental exacted by the lease and the date when the lease would expire. Each of the three after reciting those facts specified the conditions under which the lease could be renewed.

Clause 19 directed that if any item of the real property mentioned in clauses 16, 17 and 18 was sold, the sale should be subject to the lease and the option for renewal.

Clause 20 declared:

"I hereby appoint my attorney, John A. Heltzel * * * as the executor of my estate, * * *."

That clause was followed by the signatory paragraph of the will succeeded by the signature of the testatrix and the attestation of two witnesses.

The will contained two handwritten amendments which were made prior to execution. Opposite each of the two the decedent wrote in the left-hand margin these words, "before execution" and her signature.

December 8, 1948, about two weeks before Miss Wagner executed her will, she repaired to the Salem Memorial Hospital where she remained until November, 1950, when she was committed to the Oregon State Hospital. Although she received some surgical treatment in the Salem Memorial Hospital, it seems that her resort to the hospital was due principally to mental illness. However, no one contends that she lacked testamentary capacity on December 20, 1948, when she executed her will.

August 30, 1950, Miss Wagner telephoned to Mr. Heltzel and requested him to return the will to her which was then in a safety deposit vault. When she asked for the return of the will she remarked, so Mr. Heltzel testified, that "she wanted to work it over. She may have said she wanted to make some changes." By August of 1950, when Miss Wagner asked for the will, Mr. Heltzel had observed deterioration in her mental faculties and therefore took the precaution of having the will photographed before he delivered it to her. Mr. Heltzel swore that in the middle of September, 1950, Miss Wagner gave back the will to him and asked him to keep it for her "until she left the hospital and she would then make a new will."

When the will was returned to Mr. Heltzel it bore several penciled notations and markings made by the decedent. The contestants depend upon those notations and markings in large measure to establish their con-

tention that the decedent revoked her will. It should be borne in mind that it was on August 30, 1950, that Mr. Heltzel delivered the will to Miss Wagner and that it was in the middle of September, 1950, that she handed it back to him. The contestants select the day of September 5, 1950, as the probable occasion upon which the alleged revocation occurred. We will now describe the penciled notations and markings.

The first notation upon the will occurs in the right-hand margin opposite the first line of the opening paragraph of the will. That paragraph begins: "I, Nan M. Wagner, of Salem, Oregon, hereby revoke". At that point Miss Wagner wrote with a lead pencil, "this one too," and circled the words with her pencil.

The clause of the will which begins with the word "First" made a bequest of $500 to Ella Breyman Demmer. By August of 1950 Mrs. Demmer had died. At the end of that clause in the right-hand margin Miss Wagner wrote in pencil "deceased." The two notations just mentioned are the only ones upon page one.

We now turn to page two. Upon that page there appears clause 15. We have mentioned the fact that the will contained two handwritten amendments which were made prior to execution. One of those amendments, being the longer of the two, was added to clause 15. It follows: "My two buildings on Court Street, Salem, Oregon, Nos. 365 373, 383 and 387 shall be sold for cash together at not less than $175,000.00." Miss Wagner, in making her penciled markings upon the will, drew a loop around the words just quoted and placed in the right-hand margin opposite to the amendment a small x. Clause 16 also occurs on page two. It mentioned "the store space at 387 Court Street,

Salem," and took note of the fact that the space was under lease to tenants by the name of Williams for a term expiring May 31, 1951, at a rental of $250 per month. The provision went on to say that the lease granted to the tenants an option to extend the term to May 31, 1953. In the right-hand margin of the will opposite the words just quoted Miss Wagner wrote in pencil "$300 2 yrs—3 yrs option $350—per month." The 17th clause, which likewise occurs on page two, pertained to a storeroom at 383 Court Street, Salem. It stated that the storeroom was leased to Dr. Edward E. Boring and Catherine Z. Boring. Across this clause Miss Wagner penciled two large Xs and three smaller ones. The evidence indicates that before she made that lattice work Dr. Boring's lease had expired and he had vacated the storeroom. The 18th clause occurs on page three and was concerned with a store space at 365 Court Street, Salem. It mentioned that the storeroom was under lease to Sidney C. and Louise A. Jary at a rental of $135 per month. The clause granted to the lessees "the first right at their option" to renew the lease for three years more. In the right-hand margin opposite those words Miss Wagner wrote with a pencil "$145.00 per mo."

In the margin to the left of the concluding paragraph of the will which began with the words, "In witness whereof, I declare this instrument to be my will" and ended with her signature, the decedent wrote, "I will have a "New" Will September 5, 1950, Nan M. Wagner."

Miss Wagner did not strike out or in any way molest her signature to the will, nor did she disturb the signatures of the attesting witnesses. None of the markings upon the will invaded any of the words of the instrument except the five Xs which were drawn across

the 17th clause. It will be recalled that that clause pertained to a storeroom at 383 Court Street, Salem, which was vacated by the lessees before Miss Wagner made her notations.

The contestants, as we have observed, alleged that the above markings which Miss Wagner made upon her will canceled, revoked and annulled the instrument. The executor, the Knights of Pythias and the State, on behalf of the Doernbecher Hospital for Children, answered separately, each setting up the defenses that (1) the will was not revoked and (2) the deceased was of unsound mind and memory at the time of the alleged revocation. After a trial, which lasted for four days, the court dismissed the contest proceeding and admitted the will, without the penciled notations, to probate. The court held that the decedent did not revoke or alter her will. The mental capacity of Miss Wagner in September of 1950 was not determined. Upon this appeal the parties argued three questions: (1) Was the will in fact revoked or canceled; (2) if the decedent performed the requisite acts with the intention of revoking the will, did she have the necessary mental competence for the acts and intent; and (3) if the will was in fact revoked, does the doctrine of dependent relative revocation apply. In the view which we take of the case, only the first question requires answer.

■ Whether the decedent revoked her will must be determined under the provisions of ORS 114.110, which follows:

"A written will cannot be revoked or altered otherwise than by another written will, or another writing of the testator, declaring such revocation or alteration and executed with the same formalities required by law for the will itself; or unless the will

is burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by another person, in his presence, by his direction and consent; and when so done by another person, the direction and consent of the testator, and the fact of such injury or destruction, shall be proved by at least two witnesses.''

■■ The contestants cannot rely on the first or third clauses of the statute just quoted, but depend upon the second, that is, upon the clause which begins with "or unless the will is burnt, torn, canceled". The petition for contest contains the following allegation:

"Said will dated December 20, 1948, was by the deceased cancelled, revoked, annulled and obliterated and was at the death of the deceased of no legal efficacy whatsoever, and the same ought not be or have been admitted to probate, and the deceased died intestate.''

The petition submits no specific facts bearing out the above general averment. The defendants deem the quoted language as nothing more than a conclusion of law. In effect, they demur on this appeal for failure of the petition to set forth facts sufficient to constitute a cause of action. *Duby v. Hicks,* 105 Or 27, 209 P. 156. The allegation in the petition lacks the components of a good complaint in that it fails to allege the elements of a cause of action. *Grignon v. Shope,* 100 Or 611, 197 P 317, and 71 CJS, Pleading, § 20, p 52. We have repeatedly said that the failure of the complaint to state a cause of action is not waived by omission to demur in the trial court. Deficiencies going to the jurisdiction of the court cannot be waived. We are not disposed to decide this case on the procedural ground. We have here a decree for the defendants. The record is com-

plete and from it we perceive that the inadequacy in the pleading had no effect upon the trial of the case. The issues of revocation and capacity were tried at length in the circuit court. The record clearly presents to us the merits of the case and we can decide the merits even in the face of the defective pleading. In the view we take, the defendant who wishes to demur is the beneficiary of the merits, as we shall show.

The appellants-contestants state in their brief:

"The acts of Nan Wagner in X-ing out the 17th paragraph of the will, and in altering the terms of the 16th and 18th paragraphs, as well as by noting in the margin her intention to revoke the will and the fact that the first bequest had lapsed and that she would have a new will, were sufficient to constitute a revocation and obliteration if accompanied by the requisite intent."

■ The statement just quoted is unexceptionable and in accord with decisions under statutes such as ORS 114.110, supra, which hold that the question submitted to the courts in instances like the one at bar is not the quality of the marks but the intent with which they were made upon the will. *In re Dougan's Estate,* 152 Or 235, 53 P2d 511.

*In re Bond's Estate,* 172 Or 509, 143 P2d 244, held that the finding of a mutilated will among the testator's effects authorized an inference that the mutilation was done animo revocandi. The case is distinguishable from the one at bar. In the Bond case the will had suffered large parts cut from it; other parts had been lined out completely, and undisputed writings upon the remainder of the instrument indicated clearly that all of these acts were done with the sole intent of revoking the will. The instant case does not present so strong a situation.

 The burden is upon the contestants to establish an act of revocation accompanied by the requisite intent. We have said that where the question is of the testator's capacity to make a will, the burden is upon the proponent. *McRell v. Loomis,* 162 Or 97, 91 P2d 330. Where, as here, the issue is of intention to revoke, the burden is upon the proponent of the affirmative of that proposition. Schouler on Wills, 6th ed, § 784; Jarman on Wills, 8th ed, p 165; and 57 Am Jur, Wills, § 541, p 374. Therefore, we will examine the evidence which tends to show the testator's intent in making the marks and notations upon her will.

 The first item of evidence which must be considered upon the issue of revocation is, of course, the will itself. The inferences to be drawn from the will before us, when it alone is considered, are inconclusive. The penciled notation, "this one too" opposite the clause which revoked all prior wills was not, under ORS 114.110 ("executed with the same formalities required by law for the will itself") sufficient to constitute a revocation, but it may be considered as evidence of the intent which motivated the whole series of acts. *Singleton v. Shewmake et al.,* 184 Ga 785, 193 SE 232.

The most certain inference to be drawn from the notation, "this one too" is that Miss Wagner was not satisfied with the will as it stood. That inference is equally warranted by the penciled missive, "I will have a "New" Will September 5, 1950," It is reasonable to infer that the decedent would not have written those two statements unless she intended to do something about the unsatisfactory provisions. Frequently in cases of this kind where intention is problematical, the informal means of expression which the testator employed are of such a character as to leave no doubt

of his actual intent. See *In re Bond's Estate,* supra. We must proceed, however, upon reasonable inferences. Looking at this will as a whole, one can safely conclude that none of the contemplated changes—and it is undoubted that changes were contemplated—went to the root of the testator's dispositive plans. One of the clauses, opposite which a penciled notation was made, made a bequest to a friend who had died prior to the penciled notation. The clause (17th) which was crossed out with the Xs pertained to a storeroom which was under lease when the will was executed but which since that time had been vacated by the lessee. All other marks upon the will referred to the amount of rental upon items of leased property. In other words, with but one exception the markings did not refer to dispositive clauses.

If the will without more is considered, the only fair and reasonable intendment which can be drawn from it is that Miss Wagner wanted to correct some unsatisfactory points in the will. The latter itself with its markings does not establish a purpose upon her part to change her dispositive plan. We cannot say that the will shows that the decedent intended her acts to constitute a revocation of the existing will. We now turn to the testimony given by the witnesses.

Twenty-three witnesses testified. By far the greater part of their testimony went to the issue of Miss Wagner's mental competency. The contestants' brief gives us an excellent summation of all the testimony and shows that only seven of the witnesses gave any indication of what Miss Wagner said about her will. Our examination of the record reveals few additions to that

summary. We will now quote the pertinent parts of the evidence. Mr. Heltzel testified:

"Q She didn't ask you to draw a new will?

"A No, she did not but gave me back this will of hers about the middle of September, 1950, and told me to keep it for her until she left the hospital and she would then make a new will."

The essence of that excerpt was repeated several times by Mr. Heltzel. Other than the implication suggested by the foregoing answer Miss Wagner never mentioned the will to her attorney again. Asked what Miss Wagner said as to her reason for wanting the will brought to her, the answer was:

"A She wanted to look it over, and it some way gave me to understand she wanted to make some changes in it. I acted on that impression."

The next witness on the issue of revocation was a lifelong friend of the decedent, Mrs. Carrie Haas Beechler, who testified that Miss Wagner expressed dissatisfaction with her will while in Salem Memorial Hospital and planned to make another one. The following, which refers to September, 1950, is taken from this witness' testimony:

"Q Will you repeat again what words she used in talking about her will?

"A She wasn't satisfied with it, she said, she had destroyed it and was going to make a new one.

"Q Are you sure she said 'destroyed it?' Are you sure? Are you sure she used the word 'destroyed'?

＊　＊　＊

"A I don't know she used that word, but had done away with it in some manner.

"Q What word then?

"A Torn it up.

"Q She said that?

"A I don't just remember. I wouldn't swear to that."

The witness was 85 years of age.

Another lifetime friend testified that Miss Wagner on several occasions after her commitment to the State Hospital expressed a desire to get out of the institution and change her will. Another friend testified to the same effect. Mrs. Louise Jary visited frequently with Miss Wagner and made her last visit while the testatrix was in Salem Memorial Hospital in October, 1950. She testified:

"Q Do you recall what you and she talked about.

"A Well, yes, she talked about her will most of the time, principally, usually.

"Q What did she say?

"A She said she wanted to change her will as soon as she got out of the hospital.

\* \* \*

"A \* \* \* She told me she made a will before she went in for her operation.

"Q Say anything to you about its contents?

"A Not exactly, only she had made arrangements, she was going to change it when she was able to go out.

"Q She didn't tell you specifically about the contents?

"A No, she didn't tell me specifically, and I didn't ask her.

\* \* \* \* \*

"Q She did use the word 'change'?

"A She wanted to change her will, yes."

The testatrix was never specific about her intentions to the witness.

Another witness, a beneficiary under the will, Mrs. Betty Williams, testified that Miss Wagner spoke to her in general of her intention to change her will. The seventh witness to testify about the will was Mrs. Margaret F. Lachmund:

"Q She didn't discuss a will with you?
"A Only once.

"Q When was that?
"A That was towards the very end almost. She said when she left the hospital she would have to make some changes in the will because of the death of Mrs. Deming or Demer."

Nothing specific was said about the changes contemplated.

 That completes our review of the testimony on the alleged revocation. Only one witness actually testified that Miss Wagner had acted in such a way as to destroy and thereby revoke her will. But it is certain that Miss Wagner never destroyed her will. The document is before us as an exhibit. Our view of the evidence leads us to adopt the conclusion of the trial judge:

"Viewing all of the evidence of the acts and conduct of deceased in the light of an assumption that at the time in question Nan M. Wagner was mentally competent to revoke, the court is of the opinion that deceased did not mark upon the will with the intent to revoke it and that the evidence fails to establish a revocation of the will. Therefore it is unnecessary to determine whether or not she was so mentally competent at the time."

The decree of the circuit court, admitting the will to probate and dismissing the contest petition, is affirmed.

LATOURETTE, J., not participating.